**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**
**CASE NO. 1:09-CV-13-M**

SARAH E. CONDIFF                                                            PLAINTIFF

v.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT.**

HART COUNTY BOARD OF EDUCATION,
HART COUNTY SCHOOL DISTRICT
AND RICKY LINE, Individually and in his
official capacity as Superintendent of the
Hart County Board of Education                                             DEFENDANTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Comes the Plaintiff, Sarah E. Condiff, by counsel, and for her response in opposition to
Defendants' motion for summary judgment states as follows:

**COUNTERSTATEMENT OF PERTINENT FACTS**

This case is a textbook example of an employee being "blackballed" from employment with
a former employer for speaking out against the unlawful conduct of another employee.   Plaintiff is
a former employee of the Defendant, Hart County School District (hereinafter "Hart County
Schools"), where she was a full-time language arts teacher during the 2007-2008 school year at
Bonnieville Elementary School located in Bonnieville, Kentucky.  See Deposition of Sarah Condiff,
pages 29-30.  Plaintiff Condiff also served as the cheerleading coach for Bonnieville Elementary
School that school year.  See Deposition of Sarah Condiff, page 88.  On January 28, 2008, while
Plaintiff Condiff was still employed in her teaching position with the Hart County Schools, her step-
daughter approached her at home with some disturbing news.  See Deposition of Sarah Condiff,
pages 94-100.  Her step-daughter, whom was a senior at Hart County High School at the time,
informed Plaintiff Condiff that one of her teachers at Hart County High School, Mr. Keri Barrett, was

1

engaging in sexually inappropriate conversations, suggestions, and innuendoes with her during school hours.  <u>See</u> Deposition of Sarah Condiff, pages 94-100.  After her step-daughter revealed this information to Mrs. Condiff, her step-daughter begged her not to "tell her daddy."  <u>See</u> Deposition of Sarah Condiff, page 99, lines 5-6.

Mrs. Condiff then made the decision to contact her husband who was out of town on business to discuss this matter.  Mrs. Condiff stated to her husband over the telephone that "something has happened at school today and [your daughter] is going to have to talk to you about this."  <u>See</u> Deposition of Sarah Condiff, pages 99.  Plaintiff Condiff proceeded to inform her husband that her step-daughter's "teacher had said some really inappropriate things to [his daughter] and that he was making indications to proposition her for oral sex."  <u>Id</u>.  After ending the conversation with her husband, Plaintiff Condiff went and found her step-daughter and took her to a computer. <u>Id</u>.  In her deposition, Plaintiff Condiff described the events that followed:  "During that time I opened up my email with my password and I said, Kaleen, I said, you know, I don't understand what happened, write it down.  I said, write it down.  And then because she didn't want to tell her daddy.  I told her she didn't do anything wrong but that her daddy needed to know so she rewrote the accounts on my email and we emailed it to [her father]...."  <u>See</u> Deposition of Sarah Condiff, page 99, line 24-page 100, line 6.

The email that was forwarded to Plaintiff Condiff's husband provided as follows:



From: Sarah Condiff <sarah@scrtc.com>
Subject: this is it
To: chriscondiff@yahoo.com
Date: Monday, January 28, 2008, 11:25 PM

I was in the side room in the broadcasting room studio because I needed to use the computer because it has music and I needed a song to put over Homecoming. When I walked in there I noticed that the computer was locked in Mr. Barrett's name. I asked him if he coud come unlock it. He walked in and moved
the chair that was sitting
behind me, and sat down and said "oooh empty room, with a teacher." Then I asked him what song would sound good to put over homecoming. He started looking and then He started saying that at prom last year, when he was out on the dance floor, a girl was begging him to take him to the bathroom to give him a bj. And I Just kept changing the subjet to the songs. Then he started talking about how a couple girls last semester wanted to do the same thing with him. After I got the song on the jump drive I went out to the studio and he put it on my computer. Then walked away and went to talk to some other students. Then he asked everyone if all of the cameras were plugged in, nobody said anything, so I said that I would go look. He followed me in there to put something in the camera room and then I asked him which cord went to a certain camera and he said its this one, and i said oh

okay. and he said yah as she would say Stick it in.

2

See Copy of email attached as Exhibit 1 to Complaint [Document 1].   After Plaintiff Condiff's husband reviewed the email, he called his daughter to discuss the matter and then called the Plaintiff.   See Deposition of Sarah Condiff, page 103.   The following day, Plaintiff Condiff and her husband again discussed whether they should report these incidents to administrative personnel at the Hart County Schools.   See Deposition of Chris Condiff, page 23.   Chris Condiff, now deceased, testified that the following issues were discussed during the conversation the day following his receipt of the email:

> A.   Well, you know, I had a conversation with Sarah about the affects too that this would have on her job.  We spoke adamantly—it was more of a concern with me than it was for [Sarah Condiff].  To her it didn't matter and it just didn't make any difference.
>
> Q.   To Sarah?
>
> A.   To Sarah it just didn't make any difference.  I believe for me Kaleen is my daughter.
>
> Q.   When you say to Sarah it didn't matter, what did not matter?
>
> A.   It had to be done, it didn't make...it wasn't a fear for her at that time, it just didn't matter what could transpire as far as her job was concerned, there was no question that [reporting the incident to school officials] had to be done on more levels than just Kaleen being her stepdaughter but that was it because that was the way it was written.  And as I said before, my wife follows the rules.

See Deposition of Chris Condiff, page 23, line 18-page 24, line 10.  See also See Deposition of Sarah Condiff, page 103, line 23-page 104, line 2 ("We wanted to protect her, we wanted to preserve her senior year of school.  Chris said, you'll lose you job over this.  I said, you know, I can't not tell.  **I said, you've got to tell**...)(emphasis added).   Chris Condiff first obtained Plaintiff Condiff's permission to forward the email describing the sexual harassment by Mr. Barrett with her email address on it and to contact school officials prior to taking any further action.   See Deposition of Sarah Condiff, page 104, lines 4-5 and lines 22-23.   See also Deposition of Chris Condiff, page 24, lines 12-23.

On January 29, 2008, Chris Condiff contacted Chris Mueller, the principal at Hart County High School, to report the sexual harassment allegations that his daughter had made against Mr. Barrett. See Deposition of Chris Condiff, page 24, lines 12-23 and page 25.  In his deposition, Chris Condiff described his conversation with Mr. Mueller as follows:

> I told Mr. Mueller the situation.  I told him where I was [out of town on work assignment] and that my daughter was at home…**So I described in detail to Mr. Mueller the conversation that I had with Sarah and also the conversation I had with Kaleen.  We talked about what was in the email,** [then I] **forwarded the email [**with Plaintiff Condiff's email address on the "From" line**] to Mr. Mueller off of my blackberry**.

See Deposition of Chris Condiff, page 25, lines 2-12 (emphasis added).  Chris Condiff further testified that he informed Mr. Muller during the conversation that his wife, Plaintiff Condiff "was a teacher in the Hart County School District…" because Mr. Condiff had a concern with his wife retaining her employment after he reported the incidents of sexual harassment to officials at the Hart County Schools.  See Deposition of Chris Condiff, page 25, lines 23-25 and page 26-27.  Mr. Condiff and Mr. Mueller agreed to meet in person when Mr. Condiff returned from his business trip on Monday, February 4, 2008.  See Deposition of Chris Condiff, page 30.

The February 4, 2008 meeting at Hart County High School was attended by Chris Condiff, Chris Mueller, Mr. Barrett, and a guidance counselor at Hart County High School named Christie Wilcoxen.  See Deposition of Chris Condiff, page 30.  The allegations made by Mr. Condiff's daughter and the contents of the email initially forwarded by Plaintiff Condiff to her husband were discussed during this meeting, and it was agreed that Mr. Condiff's daughter would be immediately removed from Mr. Barrett's class and Mr. Barrett would have no further contact with Kalene Condiff.  See Deposition of Chris Condiff, pages 30-35.

Days after this meeting, Mr. Condiff also learned that Mr. Barrett had made sexually inappropriate remarks to another student at Hart County High School prior to the remarks made to his daughter.  See Deposition of Chris Condiff, page 36-37.  After Mr. Condiff spoke with the mother of the other child that had allegedly been harassed by Mr. Barrett and determined that Mr. Barrett

had not been disciplined for that conduct, Mr. Condiff again spoke with his wife about what should be done about the Hart County School District's inaction.  Id.  Mr. Condiff recalled that Plaintiff Condiff stated "that [the new allegation of harassment as well as his daughter's allegations of harassment] **has to be reported, it's obviously not been reported to the school board, to Mr. Line, it's time to call Mr. Line…**"  See Deposition of Chris Condiff, page 37, line 23-page 38, line 2.

After conferring with his wife, Mr. Condiff contacted Hart County School District superintendent Ricky Line and informed Mr. Line of the sexually inappropriate incidents that had occurred between teacher Keri Barrett, his daughter, and another female student at Hart County High School during the 2007-2008 school year.  See Deposition of Chris Condiff, page 38.  Mr. Condiff further informed superintendent Ricky Line that his wife was currently employed by the Hart County School District as a teacher at Bonnieville Elementary School, and that he did not want his wife to be retaliated against for these reports of sexually inappropriate conduct perpetrated by Mr. Barrett against his daughter and another student.  Id.  Mr. Condiff forwarded the email to superintendent Line that was originally forwarded to Mr. Condiff by his wife Plaintiff Sarah Condiff that is attached to the Complaint as "Exhibit 1".  Id.  Upon receipt of the email, Mr. Line told Mr. Condiff that he would "get to the bottom of [the complaints]" and would call Mr. Condiff back.  Id.  Superintendent Line called Mr. Condiff back several days later and informed him that it was his opinion that Principal Mueller had handled the Barrett matter appropriately, and further offered Mr. Condiff the opportunity to file a formal grievance against Mr. Barrett.  See Deposition of Chris Condiff, page 39.

At that point, Plaintiff Condiff and Mr. Condiff discussed whether they should initiate a formal grievance against Mr. Barrett.  See Deposition of Chris Condiff, page 41.  Mr. Condiff summarized the conversation as follows:

> At that point my wife and I had another conversation, I was even more concerned after the superintendent did not take further action against Mr. Barrett that anything further could in fact cause a lot of problems.  Bringing it out into the open could cause not only problems for my wife but also problems for my daughter…

<u>See</u> Deposition of Chris Condiff, page 42, lines 1-7.  Accordingly, Mr. Condiff and Plaintiff Sarah

Condiff made a decision to take no further action at that point against Mr. Barrett.  <u>Id</u>. at page 42.

### <u>Summary of pertinent duties of public school district's boards of education and superintendents in the Commonwealth of Kentucky</u>.

Pursuant to KRS 160.160(1), each school district shall be under the management and

control of a board of education.   Furthermore, each board of education in the Commonwealth of

Kentucky including Defendant, Hart County, Kentucky Board of Education is "a body politic and

corporate with perpetual succession."  <u>See</u> KRS 160.160(1).   It may sue or be sued; make contracts;

expend funds necessary for liability insurance premiums and for the defense of any civil action

brought against an individual board member in his official or individual capacity, or both, on

account of an act made in the scope and course of his or her performance of legal duties as a board

member.  <u>Id</u>.  Pursuant to KRS 160.290, Defendant, Hart County, Kentucky Board of Education has

the "general control and management of the public schools in its district," and **appoints the**

**superintendent of schools for the school district.**  <u>See</u> KRS 160.290 (emphasis added).

The statutory powers and duties of a superintendent in the Commonwealth of Kentucky are

enumerated, in part, by the Kentucky General Assembly at KRS 160.370 and include, but are not

limited to, serving as the executive agent of the school district's board of education; **ensuring that**

**the laws relating to schools within the school district**, the bylaws, rules, and regulations of the

Kentucky Board of Education, and the regulations and policies of the school district are carried into

effect.   Superintendents are also statutorily responsible **for the hiring and dismissal of all**

**personnel employed by the school district**.  <u>See</u> KRS 160.370 (emphasis added).

**********************************

<u>Summary of adverse employment actions taken against
Plaintiff Sarah Condiff by Defendants</u>.

1. <u>Alleged elimination of Plaintiff's teaching position with Bonnieville Elementary
School at the end of the 2007-2008 school year, the non-renewal of that contract by
Defendant Line, and the refusal to rehire Plaintiff for same position based upon
misstated fact that Plaintiff Condiff could not become certified for the Language Arts
position that she was removed from the previous year</u>.

At the end of the 2007-2008 school year, the principal of Bonnieville Elementary School

informed Plaintiff Sarah Condiff that her current language arts teaching position was being

eliminated due to a reduction in force at the school.  In her deposition, Plaintiff Condiff recalled the

conversation that she had with the principal of Bonnieville Elementary School at which time this

matter was discussed:

> ...When I received what was the pink slip letter on site at school...Principal Lori
> Chapman told me that there would be only one Language Arts teacher employed at
> the Bonnieville Elementary School.  Whereas there was initially two 8th grade
> classes there would only be one, there was only one 7th grade class.  So the next
> school year there would only be the one 8th grade class and the same situation was
> going to happen with the 5th grade, there would only then be one 6th grade class.  So
> there would only be a need for one Language Arts teacher.
>
> Q.     Did she say anything else?
>
> A.     She offered to write me a letter of recommendation.

Deposition of Sarah Condiff, Page 86.  Then on or about April 24, 2008, the fact that Plaintiff

Condiff's teaching contract with the Hart County Schools was not being renewed was confirmed

when she received a letter from Superintendent Ricky Line that provided, in pertinent part, as

follows:  "State law requires all non-tenured certified staff to receive notification of employment

status annually...This letter certifies that your employment contract with Hart County Schools will

not be renewed for the 2008-2009 school year...As changes in staff occur during the summer and

funding sources become more definite, employment opportunities may become available..."  <u>See</u>

Exhibit 1, Letter from Defendant Line to Plaintiff Condiff dated April 24, 2008.

This Court must note compare the content and tone of this letter from Defendant Line at the end of the 2007-2008 school year (after Plaintiff opposed the sexual harassment of her step-daughter and another student) with the letter that Plaintiff Condiff received from Defendant Line at the end of the 2006-2007 school year when she had served as a substitute teacher for the Hart County Schools. <u>See</u> Exhibit 2, Letter from Defendant Line to Plaintiff Condiff dated April 9, 2007(letter states "[a]s we close the 2006-2007 school year, we wish to express our appreciation for the services rendered as a substitute teacher. We wish to inform you of **reasonable assurance for employment as a substitute teacher in our school system for the 2007-2008 school year**.")(emphasis added).

However, after Plaintiff Condiff was informed of this reduction in force and removed from her former position at Bonnieville Elementary School, her Language Arts position at Bonnieville Elementary School was posted and subsequently filled for the 2008-2009 school year by the Hart County School District. <u>See</u> Exhibit 3, Hart County Board of Education Job Register for 2008-2009 school year reflecting that on June 5, 2008 two Language Arts (grades 5-8) were posted as being available at Bonnieville Elementary School. While Defendants contend that Plaintiff Condiff was not rehired for her Language Arts teaching position at Bonnieville Elementary School during the 2008-2009 school year because her provisional certification to teach the position had expired effective June 30, 2008, this position is highly misleading. Plaintiff Condiff addresses this misleading position in her deposition as follows:

> Q.     ...when you applied for the '08, '09 school year [with the Hart County Schools], you did  not apply for a Language Arts or English position did you?
> ....
>
> A.     I, again, reapplied when I saw---for a Language Arts position when I saw there was a Language Arts position open at Bonnieville assuming that was the position that I just left.
>
> Q.     Okay. But at the time you applied for that Language Arts position, you did not have a certificate that would enable you to teach Language Arts for the '08, '09 school year, correct?

A.     **I would have been eligible for certificate with offer of employment**.

Q.     **Right, but you did not have that certificate at that time?**

Deposition of Sarah Condiff, page 121, lines 5-23 (emphasis added).

Simply stated, the Defendants intentionally deprived Plaintiff Condiff of her ability to teach in the same Language Arts position at Bonnieville Elementary School that she had taught at the previous year by failing to renew her contract of employment for the 2008-2009 school year. Defendant Line's discriminatory action of failing to place Plaintiff Condiff on the list of potentially qualified applicants for the Language Arts position[1] prevented her from even being considered for the job by Principal Chapman.  Had such an offer of employment been made by Principal Chapman, then the provisional teaching certification that Plaintiff Condiff held during the 2007-2008 school year to teach Language Arts at Bonnieville Elementary School would have been renewed for the 2008-2009 school year.  This action is a clear cut adverse employment action by the Defendants against Plaintiff Condiff in retaliation for her opposition to intentional sex discrimination against her step-daughter Kalene Condiff in early 2008.

Finally, Plaintiff concedes that under certain circumstances School-Based Decision Making Committees ("SBDM") comprised of two parents of students, three teachers, and the school principal make hiring decisions regarding teaching personnel at their respective schools.  See KRS 160.345(2)(a) and (2)(h)(1).  The principal at the school with a SBDM makes the final hiring decision after consultation with the committee from a list of "qualified applicants" submitted by the local superintendent.  Id.  Nonetheless, this employment selection process does not relieve

---

1 KRS 160.345(2)(h)(1) provides that "[t]he superintendent may forward to the school council the names of qualified applicants who have pending certification from the Education Professional Standards Board based upon …alternative routes to certification pursuant to KRS 161.028."  This is the exact circumstance that Plaintiff Condiff was in after the expiration of her provisional 2007-2008 teaching certificate.  Defendant Line should have submitted Plaintiff Condiff's name for consideration for the Language Arts position at Bonnieville Elementary School for the 2008-2009 school year knowing that if she was offered the position she would again be provisionally certified for the 2008-2009 school year under the alternative routes to certification pursuant to KRS 161.028.  His intentional act of refusing to do so is an adverse employment action.

Defendant Line of his statutory duties to ensure that the laws relating to schools within the school district are complied with by making certain that all candidates that he submits for a teaching position are qualified under state and federal law, <u>See</u> KRS 160.370, and to override the decision of the principal if the candidate selected is ultimately found to be unqualified under state or federal law.

**2.  <u>Plaintiff applies for special education position at Bonnieville Elementary School for 2008-2009 school year and is not hired by principal Lori Chapman.  Instead, an unqualified individual is hired for the position based upon the actions of Defendant Line</u>.**

On or about July 24, 2008, a special education teaching position became available at Bonnieville Elementary School for the 2008-2009 school year and Plaintiff Condiff applied for this position as well.  <u>See</u> Complaint, paragraph 19 [Document 1] and Answer, paragraph 17 [Document 8].  At the time of applying for the special education teaching position at Bonnieville Elementary School, Plaintiff Condiff was fully qualified for the position pursuant to the standards promulgated by Kentucky's Education Professional Standards Board (hereinafter "EPSB").  <u>See</u> Deposition of Sarah Condiff, page 123, line 20-page 124, line 19.

However, Mr. Ricky Line, as Hart County School District's final decision-maker on certain personnel decisions and compliance with applicable state and federal laws elected to submit a teacher named Baptista Choate as a candidate for the special education position whom was not qualified and did not meet the requirements for the position pursuant to the standards promulgated by the EPSB shortly before the hiring decision.  <u>See</u> Exhibit 4, Letter from Defendant Line to Principal Lori Chapman dated July 28, 2008 submitting candidates that applied for the position that he deems are qualified for the Special Education position at Bonnieville Elementary School for 2008-2009 school year under applicable federal and state law.  <u>See also</u> Deposition of Defendant Ricky Line, page 38, lines 12-25 and page 39, lines 1-4 (Defendant Line testifies that it was his duty as superintendent to ensure that Ms. Choate was qualified for the special education position under state and federal law, and that if he determined that she was not then it was his

obligation to reject the recommendation of the principal to hire her).  Five individuals were chosen to interview for the position including Ms. Choate and Plaintiff Condiff.  See Exhibit 5, Employment Recommendation Form listing applicants interviewed.   Principal Chapman ultimately recommended that Ms. Choate and not Plaintiff Condiff be selected to fill the position.  See Exhibit 6, Employment Recommendation Form recommending Ms. Choate for special education position at Bonnieville Elementary School for the 2008-2009 school year.

After Plaintiff Condiff discovered that she was not selected for the special education teaching position at Bonnieville Elementary School and that an "unqualified" teacher had been hired in her place, she complained of the decision to Defendant Ricky Line.  See Complaint, paragraph 20 [Document 1] and Answer, paragraph 18 [Document 8].   On or about July 31, 2008, Plaintiff Condiff telephoned superintendent Line and verbally informed him that she felt she was being retaliated against by not being hired for the special education position since she participated in reporting that Hart County High School Teacher Keri Barrett had engaged in sexually inappropriate and offensive conversations, suggestions, and innuendoes with her step-daughter and another student during school hours at Hart County High School.  Id.

After this conversation, Plaintiff Condiff forwarded Defendant Line a letter with attached documentation from Kentucky's Education Professional Standards Board illustrating the deficiencies with Ms. Choate's qualifications.   See Exhibit 7, Letter from Plaintiff Condiff to Defendant Line dated July 31, 2008 with attachments.  See also Deposition of Ricky Line, page 28-31(discussing receipt of letter and attachment).  Plaintiff Condiff's complaint and documentation of how Ms. Choate was unqualified was disregarded, as Defendant Line stated that he was unable to determine if Ms. Choate was "qualified" under state and federal law for the position because "according to [the documents provided by Plaintiff Condiff and attached as Exhibit 7], a [special education teacher should be "highly qualified" under federal law before being hired], but that's not what I do, but my name's on the [list of candidates submitted to Principal Chapman as being

11

qualified]…"  See Deposition of Ricky Line, page 31, lines 15-16.  Defendant Line told Plaintiff
Condiff that the principal of each school is the hiring agent, and that the decision to hire the
"unqualified" teacher for the special education teaching position at Bonnieville Elementary School
for the 2008-2009 school year was "out of his hands."  See Complaint, paragraph 20 [Document 1]
and Answer, paragraph 18 [Document 8].  Again, this is contrary to Defendant Line's deposition
testimony that it was his duty as superintendent to ensure that Ms. Choate was qualified for the
special education position under state and federal law, and that if he determined that Ms. Choate
was not then it was his obligation to reject the recommendation of the principal to place her in the
position.  Deposition of Defendant Ricky Line, page 38, lines 12-25 and page 39, lines 1-4.

3.  **Plaintiff continues to apply for teaching positions with the Hart County Schools and is never selected for a teaching position**.

Despite being repeatedly and unlawfully rejected for numerous teaching positions in the
past, Plaintiff Condiff relentlessly attempted without success to find employment with the Hart
County Schools.  The following is a list of other positions that Plaintiff Condiff has applied for with
the Hart County Schools and was not selected for employment:

- June 2008, Special Education Position at Hart County High School.  See Exhibit 8, Qualified candidate letter from Defendant Line.  However, the principal of Hart County High School, Chris Mueller, who had knowledge regarding the complaints about Mr. Barrett sexually harassing Kalene Condiff as early as January 2008, elects not to interview Plaintiff Condiff for the position.  See Exhibit 9, Employment Recommendation Form listing candidates interviewed;

- June 2008, Special Education position at Munfordville Elementary School.  See Exhibit 10, Qualified candidate letter from Defendant Line.  However, the principal of Munfordville Elementary School, Vyetta Reynolds, elects not to interview Plaintiff Condiff for the position.  See Exhibit 11, Employment Recommendation Form listing candidates interviewed.  It is highly likely that retaliatory amicus played a role in this decision as Ms. Barrett, Keri Barrett's wife, taught at Munfordville Elementary School when the allegations against Mr. Barrett were first made.  See Deposition of Reynolds, pages 10-12 attached hereto as Exhibit 12.  Moreover, Vyetta Reynolds' daughter, Christine Wilcoxen, was present during the meeting between Chris Condiff, Chris Mueller, and Keri Barrett.  Ms. Reynolds and her daughter talk or see each other on a daily basis.  See Deposition of Reynolds, pages 18-19 attached hereto as Exhibit 12;

- <u>July 2008</u>,   Special Education position at LeGrande Elementary School.  <u>See</u> Exhibit 13, Qualified candidate letter from Defendant Line.  Plaintiff Condiff interviewed for the position but was not selected.  <u>See</u> Exhibit 14, Employment Recommendation Form listing candidates interviewed;

- <u>December 2008</u>, Special Education Teacher at Hart County High School. <u>See</u> Exhibit 15, Qualified candidate letter from Defendant Line.  However, the principal of Hart County High School, Chris Mueller, who had knowledge regarding the complaints about Mr. Barrett sexually harassing Kalene Condiff as early as January 2008, again elects not to interview Plaintiff Condiff for the position.   <u>See</u> Exhibit 16, Employment Recommendation Form listing candidates interviewed;

- **Complaint [Document 1] filed in this action on February 10, 2009, with service on Hart County Board of Education on February 17, 2009 [Document 75-5] and service on Defendant Line on the same date [Document 75-6].**

-  <u>May 2009</u>, Migrant Summer School position.  <u>See</u> Exhibit 17, Qualified candidate letter from Defendant Line.  Ricky Line has final hiring authority on this position but conveniently testifies that he delegated the authority to make a recommendation on who should be hired for the position to Steven Caven. See Deposition of Line, pages 40-44.  Plaintiff Condiff is interviewed but not selected for the position.  <u>See</u> Exhibit 18, Employment Recommendation Form listing candidates interviewed;

- <u>June 2009</u>, Special Education Teacher at Hart County High School. <u>See</u> Exhibit 19, Qualified candidate letter from Defendant Line.  The principal of Hart County High School, Chris Mueller, interviews Plaintiff Condiff for the position on this occasion but does not hire her.  <u>See</u> Exhibit 20, Employment Recommendation Form listing candidates interviewed;

- <u>July 2009</u>, Special Education Teacher at Memorial Elementary School. <u>See</u> Exhibit 21, Qualified candidate letter from Defendant Line.  The principal of Memorial Elementary School, Allen Poynter, testifies that he interviews Plaintiff Condiff for the position after he is contacted by Wesley Waddle, assistant superintendent for the Hart County Schools, and requested to do so.  <u>See</u> Exhibit 22, Excerpt from Deposition of Poynter, page 15. Principal Poynter interviews Plaintiff Condiff but does not hire her for the position.  <u>See</u> Exhibit 23, Employment Recommendation Form listing candidates interviewed.

Based upon the foregoing chronology of events, there is a well-established pattern or practice within the Hart County Schools after the Plaintiff had engaged in protected activity under Title IX of (1) not interviewing Plaintiff Condiff for a position despite the fact that she is deemed qualified for the position; and (2) interviewing Plaintiff Condiff, sometimes at the request of members of the office of the superintendent, and not hiring the Plaintiff.  There is also credible

evidence that the vast majority of the decision-makers in this small, closely knit school district had knowledge that Plaintiff Condiff had assisted her step-daughter in reporting allegations of sexual harassment against Mr. Barrett prior to the hiring decisions being made.  Accordingly, this well-established pattern is circumstantial evidence of the intent to discriminate against the Plaintiff by agents and employees of the Defendant, Hart County School District, for Plaintiff's participation in reporting the harassment by Mr. Barrett and for the multiple instances in which she opposed such outrageous conduct.

### ARGUMENT

**I. Summary Judgment Standard:**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Logan v. Denny's, Inc., 259 F.3d 558, 566 (6th Cir.2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, `but to determine whether there is a genuine issue for trial.'" Little Caesar Enters., Inc. v. OPPCO, LLC, 219 F.3d 547, 551 (6th Cir.2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "A genuine dispute between the parties on an issue of material fact

14

must exist to render summary judgment inappropriate." <u>Hill v. White</u>, 190 F.3d 427, 431 (6th Cir.1999) (*citing* <u>Anderson</u>, 477 U.S. at 247-49, 106 S.Ct. 2505).

## II.     <u>Defendant, Hart County, Kentucky School District, is a proper party Defendant in this Action in addition to the Defendant, Hart County, Kentucky Board of Education</u>.

In its motion for summary judgment, Defendant, Hart County, Kentucky School District, contends that all claims against it must be dismissed since there is no legal entity capable of being sued.  However, this argument is without merit.[2]  First, KRS 160.010 provides, in pertinent part, that "[e]ach county in this state constitutes a county school district…"  Accordingly, the school district within Hart County, Kentucky is considered to be the "Hart County, Kentucky School District" by virtue of the express language of KRS 160.010.  Although Defendants argue that the Hart County, Kentucky Board of Education is the only proper party to sue under the provisions of KRS 160.160(1), which provides "[e]ach school district shall be under the management and control of a board of education," this language does not preclude a legal action directly against the school district itself.

To the contrary, this language suggests that county board members in the Commonwealth of Kentucky are comparable to officers in a corporation with fiduciary duties to act in the best interests of the school district.  The most compelling piece of evidence that the Hart County School District is a proper party to this action is a contract of employment between Plaintiff Condiff and the Hart County School District.  <u>See</u> Exhibit 24, Contract of employment between Plaintiff Condiff and the Hart County School District dated August 6, 2007.  This contract confirms that the Hart County School District is a viable legal entity capable of entering into a contract and also of being sued.

_____

[2] This Court should note that in the Defendants' Answer [Document 8], the Defendants' admit that "Defendant, Hart County, Kentucky School District, is a school district within the Commonwealth of Kentucky pursuant to KRS 160.010 which provides, in pertinent part, "[e]ach county in this state constitutes a county school district…" Hart County, Kentucky School District's principal administrative offices are located at 511 West Union Street, Munfordville, Kentucky  42765."  <u>See</u> Answer [Document 8], paragraph 2 and Complaint [Document 1], paragraph 2.

While Plaintiff agrees with Defendants that KRS 160.160(1) provides that each board of education in Kentucky including Defendant, Hart County, Kentucky Board of Education is "a body politic and corporate with perpetual succession" that may sue or be sued, this statutory language still does not expressly preclude a direct action against the school district that the board of education operates and manages.  The language set forth at KRS 160.160(1) also enables school district's boards of education to protect themselves in their respective fiduciary capacities by providing for the purchase of liability insurance premiums and for the defense of any civil action brought against an individual board member in his official or individual capacity, or both, on account of an act made in the scope and course of his or her performance of legal duties as a board member.  See KRS 160.160(1).  Finally, KRS 160.160(1) allows the boards of education to enter into contracts as officers of the school district in order to enable to board members to satisfy their statutory duty of "managing and controlling" the county school district.  Based upon the foregoing, both Hart County, Kentucky School District and the Hart County, Kentucky Board of Education are proper Defendants in this action.

## III.  Title IX Claims:

The Education Amendments Act of 1972, 92 P.L. 318, 86 Stat. 235, § 901 set forth a provision that was later codified in 20 U.S.C. § 1681 stating in pertinent part: "(a) Prohibition against discrimination; exceptions. No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[3]...." The Supreme Court

---

[3] Defendant, Hart County Board of Education, admits in the Defendants' Answer that it is subject to the provisions of The Education Amendments Act of 1972, 92 P.L. 318, 86 Stat. 235, § 901 (20 U.S.C. § 1681 et seq.) otherwise known as Title IX.  See Defendants' Answer to Complaint [Document 8], paragraph 7 admitting allegation, in part, of paragraph 8 of the Complaint [Document 1].  Plaintiff further contends, as argued previously in this Response, that Defendant, Hart County, Kentucky School District, is also a proper party Defendant to this action and also subject to the provisions of Title IX.  Nonetheless, if this Court finds that Defendant, Hart County, Kentucky School District, is not a proper party to this action, this has no impact on whether the Plaintiff may proceed with her respective claims as alleged under Title IX since Defendant, Hart County Board of Education, would be the legal entity subjected to potential liability under Title IX by its

recognized that this section set forth "a cause of action for private victims of discrimination", Cannon v. University of Chicago, 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560, 582 (1979), that "[monetary] damages [are] available for an action brought to enforce Title IX," Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 76, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208, 224 (1992), and recognized sexual discrimination of a high school student by her teacher is actionable when "actual notice" of the harassment is given to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures", Gebser v. Lago Vista Independent School District, 524 U.S. 274, 290, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277, 292 (1998),  and a lack of response by that official demonstrates "deliberate indifference to [the] discrimination" Id.

Most recently, the Supreme Court has found that Title IX is also violated when a recipient of federal funding retaliates against a person "because he complains of sex discrimination" as it is "intentional `discrimination' `on the basis of sex'". Jackson v. Birmingham Board of Educ., 544 U.S. 167, 173-174, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361, 370-371 (2005). **Retaliation claims under Title IX also "extend to those who oppose discrimination against others."** Id. at 180. (emphasis added).  In Jackson, Roderick Jackson began his employment with the Birmingham, Alabama school district in 1993 when he was hired to serve as a physical education teacher and girls' basketball coach.  Id., 544 U.S. at 171.  Jackson was transferred to Ensley High School in August 1999 at which time he discovered that the girls' basketball team was not receiving equal funding and equal access to athletic equipment and facilities as the boys' basketball team.  Id.  The lack of adequate funding, equipment, and facilities made it difficult for Jackson to do his job as the girls' team's coach.  Id.

In December 2000, Jackson began complaining to his supervisors about the unequal treatment of the girls' basketball team, but Jackson's complaints went unanswered and the school failed to remedy the situation.  Id.  Instead, Jackson began to receive negative work evaluations and ultimately was removed as the girls' coach in May 2001.  Id. at 172.  After the Board terminated

---

receipt of federal funding.  See also   Deposition of Line, pages 33-35(testifying that the Hart County School District receives Title I federal funding).

Jackson's coaching duties, he filed suit in the United States District Court for the Northern District of Alabama alleging, among other things, that the Birmingham Board of Education (the "Board") violated Title IX by retaliating against him for protesting the discrimination against the girls' basketball team.  Id.  The Board moved to dismiss on the ground that Title IX's private cause of action does not include claims of retaliation.  Id. The District Court granted the motion to dismiss. Id.

The Court of Appeals for the Eleventh Circuit affirmed the decision of the District court holding that (1) Jackson's suit failed to state a claim because Title IX does not provide a private right of action for retaliation as nothing in the text of Title IX indicates any congressional concern with retaliation that might be visited on those who complain of Title IX violations; (2) Since the Department of Education regulation expressly prohibiting retaliation does not create a private cause of action for retaliation because Congress has not created a right through Title IX to redress harms resulting from retaliation, then the regulation may not be read to create one either; and (3) Even if Title IX prohibits retaliation, Jackson would not be entitled to relief because he is not within the class of persons protected by the statute.  Id.

In overruling the decisions of the District Court and the Court of Appeals for the Eleventh Circuit, the United States Supreme Court reasoned as follows:

> ...Title IX...broadly prohibits a funding recipient from subjecting any person to "discrimination" "on the basis of sex." (citation omitted). Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. (citations omitted). Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.
>
> The Court of Appeals' conclusion that Title IX does not prohibit retaliation because the 'statute makes no mention of retaliation,' **ignores the import of our repeated holdings construing 'discrimination' under Title IX broadly**.  Though the statute

18

does not mention sexual harassment, we have held that sexual harassment is intentional discrimination encompassed by Title IX's private right of action. (citations omitted). **'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach**. See *North Haven Bd. of Ed. v. Bell,* 456 U. S. 512, 521 (1982) (Courts "'must accord'" Title IX "'a sweep as broad as its language'").

Jackson, 544 U.S. at 173-175. (emphasis added).  The following paragraphs summarize the United

States Supreme Court's other legal conclusions supporting its decision in Jackson:

(1) "Title IX was enacted in 1972, three years after our decision in Sullivan v. Little Hunting Park, Inc., 396 U.S. 229 (1969). In *Sullivan,* we held that Rev. Stat. § 1978, 42 U.S.C. § 1982, which provides that "[a]ll citizens of the United States shall have the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property," protected a white man who spoke out against discrimination toward one of his tenants and who suffered retaliation as a result. Sullivan had rented a house to a black man and assigned him a membership share and use rights in a private park. The corporation that owned the park would not approve the assignment to the black lessee. Sullivan protested, and the corporation retaliated against him by expelling him and taking his shares. Sullivan sued the corporation, and we upheld Sullivan's cause of action under 42 U. S. C. § 1982 for "[retaliation] for the advocacy of [the black person's] cause." 396 U. S. at 237. **Thus, in *Sullivan* we interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition**." Jackson, 544 U.S. at 176 (emphasis added); and

(2) "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also 'to provide individual citizens effective protection against those practices.' Cannon, 441 U. S. at 704. We agree...that this objective would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation.  If recipients were permitted to retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of Title IX violations might go unremedied as a result. See Sullivan, *supra,* at 237 (noting that without protection against retaliation, the underlying discrimination is perpetuated)...Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel...Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference claims would be short circuited, and the underlying discrimination would go unremedied." Jackson 544 U.S. at 180-81.

Although the United States Supreme Court's decision in Jackson did not articulate the exact

framework under which a Title IX retaliation claim should be analyzed, it has been a past practice of

the United States Supreme Court to turn to Title VII jurisprudence to interpret Title IX sexual

harassment claims.   See Franklin v. Gwinnett County Pub. Schs., 503 U. S. 60 (1992)(Court

comparing the duties of a school district to prevent sexual harassment under Title IX to the Title VII duties of an employer).   See also  Doe v. Claiborne County, 103 F.3d 495, 514, 515 (6th Cir. 1996)(court holding that "a 'hostile environment' sexual harassment claim is cognizable under Title IX," and that Title VII principles guide resolution of such a claim).

It is well established that to prevail upon a Title VII retaliation claim, "a plaintiff must establish that: (1)[he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir.2008).    In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court explained that the "adverse employment action" prong is objective, thus requiring courts to consider whether "a reasonable employee would have found the challenged conduct materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S.Ct. at 2415.   Title VII's protections were intended to "prohibit employer actions that are likely `to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." Id. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).    An objective standard properly gauges the challenged conduct of the employer against the likely actions of a reasonable employee by "avoid[ing] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiffs unusual subjective feelings." Id.

Once the plaintiff establishes a *prima facie* case of retaliation, then the burden shifts to the Defendant employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Penny v. United Parcel Service, 128 F.3d 408, 417 (6th Cir. 1997).  Should the Defendant offer a non-discriminatory reason for the adverse employment action, then the burden

shifts back to the Plaintiff to prove that the proffered reason for the action was merely a pretext[4] to discrimination.  Id.   The plaintiff may establish that the proffered reason was a mere pretext by showing that (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; and (3) that the stated reasons were insufficient to explain the defendant's action. See Wheeler v. McKinley Enters., 937 F.2d 1158, 1162 (6th Cir. 1991).  Courts have articulated a number of other methods for establishing that an employer's non-discriminatory explanation for an adverse employment action is "pretextual."  These methods include:

(1)   Evidence that other similarly situated employees who had not filed complaints of discrimination performing as the Plaintiff were treated more favorably—i.e. "disparate treatment".   "Intent to discriminate" may be inferred from circumstantial evidence showing that Plaintiff was treated worse than other similarly situated persons in other racial groups, or in this case, who had not filed charges of discrimination with the EEOC. McDonald Douglas, 411 U.S. 792 (1973);

(2)   Evidence of past discrimination from which a jury could reasonably infer pretext to the proffered explanation;

(3)   Statements made by supervisors carrying the inference that the supervisor harbored animosity against protected classes of people or conduct are clearly probative of pretext.  Hodgens v. General Dynamics Corp., 144 F.3d 151, 171 (1st Cir 1998);

(4)   Evidence showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for adverse employment action such that a reasonable person would find it unworthy of credence. Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997); or

(5)   Direct evidence establishing that the employer's proffered reason is unworthy of credence.  Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248 (1981).


A.   **Plaintiff Condiff has a viable cause of action for retaliation under Title IX against the Defendants as she assisted her step-daughter who was subjected to sexual harassment by a teacher employed by the Hart County School District ("Hart County Schools") in reporting the allegations of sexual harassment to administrative personnel within the Hart County Schools, engaged in "opposition activities," and suffered "intentional discrimination on the basis of sex" as a result**

---

[4]  When a Plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be "particularly cautious" about granting the employer's motion for summary judgment. Stepanischen v. Merchant's Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983).

**of trying to vindicate the rights of her student step-daughter to be free from sexual harassment as a student of Hart County High School**.

As demonstrated below, the record evidence establishes a *prima* facie claim of retaliation under Title IX.

**1. Plaintiff Condiff engaged in a Protected Activity under Title IX that was known to the Defendants in this case**.

As stated previously, the United States Supreme Court has found that Title IX is violated when a recipient of federal funding retaliates against a person "because he complains of sex discrimination" as it is "intentional `discrimination' `on the basis of sex'". Jackson v. Birmingham Board of Educ., 544 U.S. 167, 173-174, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361, 370-371 (2005). The Court further found that retaliation claims under Title IX also "extend to those who oppose discrimination against others." Id. at 180. In determining what opposition to discrimination means within the context of Title IX, this Court should look to the United States Supreme Court's decision in Crawford v. Metropolitan Government of Nashville, __ U.S. ___, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) since the United States Supreme Court has already sanctioned the use Title VII framework to analyze Title IX sexual harassment claims. See Franklin v. Gwinnett County Pub. Schs, *supra*. In Crawford, the Court reinforced a broad reading of the term "oppose" in several key respects. First, it rejected a definition of "oppose" that included only "active, consistent `opposing' activities"—the Court referred to such a rule as "freakish." Id. at 851. Second, the Court held that "oppose" could also mean "to be hostile or adverse to, as in opinion." Id. at 850 (quoting *Random House Dictionary of the English Language* 1359 (2d ed.1987)) Third, and most importantly, the Court provided as follows:

> 'Oppose' goes beyond 'active, consistent' behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. **Countless people were known to 'oppose' slavery before Emancipation, or are said to 'oppose' capital**

**punishment today, without writing public letters, taking to the streets, or resisting the government.**

<u>Crawford</u>, 129 S.Ct. at 851 (emphasis added).

In this case, Plaintiff Condiff engaged in protected activity under Title IX in a number of instances.  First, Sarah Condiff aided or assisted her step-daughter in preparing and filing her discrimination complaint that was ultimately forwarded to Chris Mueller, the principal of Hart County High School as well as to Defendant Ricky Line.  Although she did not draft the email herself, she instructed her step-daughter to document these incidents of sexual harassment so that everyone could have a better understanding of what had happened between Kalene Condiff and Mr. Barrett.  The action of aiding or assisting another in filing a complaint is protected activity under Title IX.  Moreover, the following actions on the part of Plaintiff Condiff constitute "opposition" to the sexual harassment of her step-daughter by her teacher which is also protected activity under Title IX:

(1) Plaintiff Condiff had an overriding desire to protect her step-daughter from harm and to preserve her senior year of high school as much as possible.  Plaintiff Condiff and her husband both reflected on the fact that Plaintiff Condiff could loss her job for opposing the sexual harassment or not preventing her husband from raising the issue with the Hart County Schools.  Nonetheless, Plaintiff Condiff expressed her great opposition to this type of outrageous behavior directed not only towards her step-daughter but also a student in the school system she taught in.  Plaintiff Condiff knew the incidents needed to be reported, and she allowed her husband to forward the email describing the sexual harassment by Mr. Barrett with Plaintiff Condiff's email address on it to the school principal Chris Mueller and to contact Mr. Mueller directly despite the potential future consequences with her employment.  As described in <u>Crawford</u>, expressing an adverse opinion towards conduct is the plain meaning of opposition.  The email with the Plaintiff's address atop it was a strong signal to administrative officials within the Hart County Schools that she opposed the intentional discrimination against her step-daughter and wanted a resolution;

(2) Plaintiff Condiff again expressed her opposition to Mr. Barrett's repeated sexual harassment of female students including her step-daughter when she informed her husband that "that [the new allegation of harassment as well as his daughter's allegations of harassment] **has to be reported, it's obviously not been reported to**

**the school board, to Mr. Line, it's time to call Mr. Line…**"   <u>See</u> Deposition of Chris Condiff, page 37, line 23-page 38, line 2;

(3) On or about July 31, 2008, Plaintiff Condiff telephoned superintendent Line and verbally informed him that she felt she was being retaliated against by not being hired for the special education position since she participated in reporting that Hart County High School Teacher Keri Barrett had engaged in sexually inappropriate and offensive conversations, suggestions, and innuendoes with her step-daughter and another student during school hours at Hart County High School;

(4) If Defendant Line and other administrative officials in the Hart County Schools did not already know that Plaintiff Condiff was a teacher in the Hart County School District, this fact was made apparent when Mr. Condiff directly informed superintendent Ricky Line that his wife was currently employed by the Hart County School District as a teacher at Bonnieville Elementary School, and that he did not want his wife to be retaliated against for her opposition to the sexually inappropriate conduct perpetrated by Mr. Barrett against his daughter and other students.  Similarly, Mr. Condiff discussed the fact that his wife was a teacher in the Hart County School District with Chris Muller when he initially forwarded the email describing the events of sexual harassment with Plaintiff Condiff's name on it to Mr. Mueller and spoke to him over the telephone; and

(5)  On February 17, 2009, Defendants Ricky Line and the Hart County Board of Education were served with the summons and Complaint in this action.  The filing of the Complaint in the name of Sarah Condiff against the party Defendants is an outright expression of opposition to conduct prohibited by Title IX.

Simply stated, the Court in <u>Crawford</u> reasoned that the term "oppose," given its common everyday meaning, includes the silent opposition of everything from gay marriage to the death penalty without requiring anyone to shout it from the rooftops.  Despite the Defendants position to the contrary and when considering the United States Supreme Court's decision in <u>Crawford</u>, *supra.* and <u>Jackson</u>, *supra.*, Plaintiff Condiff's mostly silent but clear opposition to intentional sexual harassment against her step-daughter and another female student at Hart County High School is very similar to the actions of Mr. Jackson in advocating for the rights of the girls' basketball team to be treated equally and also similar to Mr. Sullivan's advocacy for the rights of African-American's in the Title VI case of <u>Sullivan v. Little Hunting Park, Inc.</u>, 396 U.S. 229 (1969).  The standards for

opposing activities that are prohibited under Title IX under the principles articulated by the United

States Supreme Court in <u>Jackson</u> are clearly met by the above-described conduct of Plaintiff Condiff.

Moreover, it is beyond dispute that the Defendants were well aware of Plaintiff's opposition to

intentional sex discrimination perpetrated against her step-daughter and another student at Hart

County High School by Mr. Barrett as early as January 2008.

**2.** **Defendants took adverse employment actions against Plaintiff Condiff for engaging in a Protected Activity under Title IX.**

The adverse employment actions taken by the Defendants against Plaintiff for engaging in

protected activities under Title IX have been discussed at length in the "Counterstatement of Facts"

section of this response and are hereby incorporated by reference in this section of the brief.  See

pages 7-14.  Moreover, there is a casual connection between the Plaintiff's exercise of protected

activities under Title IX and the adverse employment actions discussed above.   The evidence

supporting this conclusion is as follows:

(1)    The Defendants' decision not to renew Plaintiff's contract for the 2008-2009 school year took place in April 2008, when Plaintiff's exercise of protected activities under Title IX first were first known by the Defendants as early as January 2008 prior to the completion of the 2007-2008 school year.  Compare Defendants' conduct under those circumstances with the previous school year in which the Plaintiff did not engage in protected activities under Title IX.  At the completion of the 2006-2007 school year, Plaintiff was offered "reasonable assurances" for employment the following year in the Hart County Schools.  <u>See</u> Exhibit 2, Letter from Defendant Line dated April 9, 2007.  It is also undisputed that Plaintiff was in fact reemployed with the Hart County Schools in a full-time Language Arts teaching position at Bonnieville Elementary School for the 2007-2008 school year—i.e. prior to her engagement in protected activities under Title IX.  However, since engaging in the protected activities under Title IX that were clearly known to the Defendants as early as January 2008, Defendants have refused to renew her contract at Bonnieville Elementary School for the 2008-2009 school year because she allegedly was not certified for the position, and also refused to interview her on three occasions from June 2008 through December 2008 for positions she was qualified for, and also refused to hire her for teaching positions she has applied for on seven different occasions always under the pretext that someone else is better qualified; and

(2)    The Defendants', Hart County, Kentucky School District and Hart County Board of Education, agents had knowledge of Plaintiff's engagement in protected activities under

Title IX prior to taking adverse employment actions against the Plaintiff.[5]   This knowledge or reasonable inference thereof is fully discussed in the "Counterstatement of Facts" section of this response and are hereby incorporated by reference in this section of the brief.  See pages 7-14.

Since the Plaintiff has made her *prima facie* case of retaliation under the provisions of Title IX, the burden then shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment actions it took against the Plaintiff.  As discussed above, the Plaintiff has been treated differently by the Hart County Schools since she engaged in protected activities under Title IX.  Furthermore, the Defendants' explanation that Plaintiff's teaching contract was not renewed for the 2008-2009 school year following her express opposition to the intentional sexual discrimination that her step-daughter and another student at Hart County High School was subjected to is wholly without credence.

Clearly, the Defendants deprived Plaintiff Condiff of her ability to teach in the same Language Arts position at Bonnieville Elementary School that she had taught at the previous year by failing to renew her contract of employment for the 2008-2009 school year.  Defendant Line's discriminatory action of failing to place Plaintiff Condiff on the list of potentially qualified applicants for the Language Arts position prevented her from even being considered for the job by Principal Chapman.   Had such an offer of employment been made by Principal Chapman, then the provisional teaching certification that Plaintiff Condiff held during the 2007-2008 school year to teach Language Arts at Bonnieville Elementary School would have been renewed for the 2008-2009 school year.  Also, many of the employment decisions made after Plaintiff engaged in protected activity were made by agents of the Defendants with knowledge or who likely had knowledge of Plaintiff's protected activity prior to the adverse employment decisions being made.  Other reasons

---

[5] In Raney v. Vinson Guard Service, 120 F.3d 1192 (11th Cir. 1997), the Eleventh Circuit Court of Appeals held that proof that the corporate agent who took adverse action against the Plaintiff was aware of Plaintiff's protected expression prior to his or her decision to terminate the Plaintiff was sufficient evidence to satisfy the casual link prong of a prima facie retaliation case under Title VII.

establishing pretext are discussed at length in the "Counterstatement of Facts" section of this response and are hereby incorporated by reference in this section of the brief.  See pages 7-14 and page 25.

Accordingly, when "view[ing] the factual evidence and draw[ing] all reasonable inferences in favor of the non-moving party," as is required on summary judgment, it is reasonable to infer that Plaintiff Sarah Condiff not only assisted her step-daughter in reporting sexual harassment to administrative personnel of the Hart County Schools, but also opposed the discrimination against her step-daughter as well. Such an inference not only is reasonable, but also is likely the most accurate description of Plaintiff Condiff's involvement. Moreover, it is reasonable to infer that, given Hart County School's knowledge regarding Sarah Condiff's relationship with her husband and step-daughter, Hart County School personnel believed that Plaintiff Condiff opposed the discrimination against her step-daughter and took adverse employment actions against Plaintiff Condiff thereafter for that opposition.

**B.** **Even if this Court finds that Plaintiff Condiff cannot meet her *prima facie* case of retaliation under Title IX because she did not engage in a "protected activity" under the statute,  Plaintiff Condiff still has a viable cause of action for Third-Party retaliation under Title IX as Congress intended that Title IX Cover Third-Party Retaliation as a Form of Intentional Discrimination Prohibited by the Statute .**

It has long been held that "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner." Davis v. Passman, 442 U.S. 228, 240, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).   "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Furthermore, whether a statute is plain and unambiguous must be determined

"with regard to the particular dispute in the case." Id. at 340.  Moreover, "[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." Bob Jones University v. United States, 461 U.S. 574, 586 (1983).

In 1975, subsequent to Title IX's passage by Congress, the U.S. Department of Health, Education and Welfare ("HEW") promulgated regulations interpreting the statute.  As required by law at the time, HEW submitted these regulations to Congress for review.[6]  Congress deliberated at length on whether to modify or disapprove the regulations submitted by HEW, and rejected each and every attempt to do so.[7]  In  North Haven Board of Education v. Bell, 456 U.S. 512, 531-34 (1982), the United States Supreme Court noted the significance of Congress's refusal to alter the Title IX regulations as proposed as follows:

> Then, in June 1974, HEW published proposed Title IX regulations pursuant to § 902. (citation omitted)... During the comment period, nearly 10,000 formal responses to the regulations were submitted, reputedly the most HEW had ever received on one of its proposals. (citations omitted)...  On June 4, 1975, HEW published its final Title IX regulations, see 40 Fed.Reg. 24128 (1975), and, as required by § 431(d)(1) of the General Education Provisions Act, Pub.L.93-380, 88 Stat. 567, as amended, 20 U.S.C. § 1232(d)(1), submitted the regulations to Congress for review. This "laying before" provision was designed to afford Congress an opportunity to examine a regulation and, if it found the regulation "inconsistent with the Act from which it derives its authority . . .," to disapprove it in a concurrent resolution. If no such disapproval resolution was adopted within 45 days, the regulation would become effective.
>
> Resolutions of disapproval were introduced in both Houses of Congress. The two Senate resolutions ... were not acted upon. In the House, the Subcommittee on Postsecondary Education of the House Committee on Education and Labor held six days of hearings to determine whether the HEW regulations were "consistent with

[6] Section 431(d)(1) of the General Education Provision Act, Pub. L. No. 93-380, 88 Stat. 567, as amended 20 U.S.C. Section 1232(d)(1)(repealed in 1994), provided that in addition to publishing a regulation in the Federal Register, the regulation must be transmitted to Congress and "shall become effective not less than forty five days after such transmission unless Congress shall, by concurrent resolution...disapprove such [regulation]."

[7] See S. Con. Res. 46, 94th Cong., 121 Cong. Rec. 17,300 (1975); H.R. Con. Res. 310, 94th Cong., 121 Cong. Rec. 19,209 (1975).

the law and with the intent of the Congress in enacting the law." (citation omitted). Following the hearings, members of the Subcommittee on Postsecondary Education introduced concurrent resolutions disapproving certain portions of the HEW regulations, but not referring specifically to the employment regulations. (citations omitted).  Neither resolution was passed, and HEW's regulations went into effect on July 21, 1975.

Id.  One of the regulations submitted by HEW included as express prohibition on retaliation.  This regulation, which is in its same form as when it was sanctioned by Congress on July 21, 1975, is currently encoded at 34 C.F.R. Section 106.71(incorporating by reference 34 C.F.R. Section 100.7(e)), provided as follows:

> (e)  Intimidatory or retaliatory acts prohibited.  No recipient or other person shall intimidate, threaten, coerce, or discriminate against **any individual** for the purpose of interfering with any right or privilege secured by ...[Title IX], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title IX]...

Id. (emphasis added).[8]

Since the adoption of the implementing regulations, Congress has never suggested any disagreement with their provision of protection against retaliation despite the fact that Congress has repeatedly amended Title IX when it thought its intent was being misconstrued.  For example, following the United States Supreme Court's decision in Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985), which held that non-consenting States could not be sued for violations of Title IX, Congress expressly amended Title IX and similar statues to reflect its intent to abrogate the states' sovereign immunity thereunder.  See 42 U.S.C. Section 2000d-7.

1. **How does the language of Title IX's implementing regulation prohibiting retaliation impact this Court's determination as to whether Congress intended Title IX to prohibit third-party retaliation by "funding recipients" such as the Defendants in this case**?

---

[8]  The successor agency to HEW, the U.S. Department of Education, later readopted these regulations in 1980. See  Title IX Regulations, 45 Fed. Reg. 30,955 *et seq.* (May 9, 1980).

As discussed previously, the fact that Congress had the opportunity to review the express language of the anti-retaliation regulation currently encoded at 34 C.F.R. Section 106.71 prior to passing Title IX strongly suggests that Congress intended Title IX to cover third-party retaliation claims.  The language of the regulation is the key to this conclusion.  The implementing regulation regarding retaliation under Title IX is significant and provides, in pertinent part, as follows: "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against **any individual** for the purpose of interfering with any right or privilege secured by …[Title IX]…"  <u>See </u>34 C.F.R. Section 106.71(incorporating by reference 34 C.F.R. Section 100.7(e)).  The choice of the words **"discriminate against any individual"** suggests that Congress intended retaliation claims under Title IX to be broadly construed and to include third-party retaliation claims.

Compare this language with Title VII of the Civil Rights Act's anti-retaliation provision set forth at 42 U.S.C. Section 2000e-3(a) which provides that it is "an unlawful employment practice for an employer **to discriminate against any of his employees or applicants for employment** … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" and it is clear as to what Congress intended with regard to these two civil rights statutes.  <u>See</u> 42 U.S.C. Section 2000e-3(a)(emphasis added).  Congress' decision to use the terms "discriminate against any of his employees or applicants for employment" has consistently been held to prohibit third-party retaliation claims under the provisions of Title VII.  <u>See</u> <u>Thompson v. North American Stainless, LP</u>, 567 F.3d 804 (6th Cir. 2009), *cert. granted*, <u>Thompson v. North American Stainless, LP</u>, No. 09-291 (U.S. 2010)(holding that the plain language of the statutory text of 42 U.S.C. Section 2000e-3(a) does not authorize a third-party retaliation claim under Title VII).

**2. Title VII and Title IX are vastly different statutes. Title IX's cause of action for retaliation is implied and must be broadly construed to effectuate the remedial purpose of the statute by allowing third-party retaliation claims.**

Although the Sixth Circuit Court of Appeals has ruled that express language of Title VII's anti-retaliation provision does not provide for third-party retaliation claims, See Thompson, *supra*., Title VII is a vastly different statute from Title IX. First, Title IX's cause of action for retaliation is implied, while Title VII's is express. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U. S. 274 at 283-284 (1998). See also Jackson v. Birmingham Board of Educ., *supra.* Moreover, Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition. See 20 U. S. C. § 1681. See also Gebser, 524 U.S. 274 at 283-84, 286-87. By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute. See 42 U. S. C. §§ 2000e-2 (giving examples of unlawful employment practices), 2000e-3 (prohibiting "[o]ther unlawful employment practices," including (a) "[d]iscrimination" in the form of retaliation; and (b) the discriminatory practice of "[p]rinting or publication of notices or advertisements indicating prohibited preference ...").

Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, the statute must be broadly construed to effectuate its remedial purpose of eliminating intentional discrimination on the basis of sex by educational institutions receiving federal funding. One such construction that is consistent with the legislative history of Title IX that would further the Act's remedial purpose is to allow third-party retaliation claims. Any contrary interpretation would destroy the remedial purpose of Title IX by deterring individuals subjected to sex discrimination from reporting discrimination to funding recipients for fear that close family members would be subjected to retaliation for their actions.

Finally, a holding that third-party retaliation claims are viable under Title IX is consistent with the United States Supreme Court's holding in Jackson, *supra.* As the Court reasoned in Jackson,

"[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination . . . . Retaliation is, by definition, an intentional act... Moreover, retaliation is discrimination `on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.   Jackson, 544 U.S. at 173-174 (citations omitted).  Retaliation against a third-party because of a close family member's complaints of sex discrimination is no less an intentional act than retaliation against the person actually making the complaint.  Thus, a holding that third-party retaliation claims are viable under the provisions of Title IX would be consistent with the United States Supreme Court's proscription against intentional discrimination in the form of retaliation as set forth in Jackson v. Birmingham Board of Education., *supra.*

    For the reasons set forth in this section, this Court should hold that third-party retaliation claims are viable under the provisions of Title IX.

IV.    **42 U.S.C. Section 1983 Claims:**

    Plaintiff asserts that her First Amendment Right to freedom of speech was violated when she assisted her step-daughter in reporting sexual harassment by a teacher at Hart County High School and otherwise opposed this unlawful conduct, and was then retaliated against by administrative personnel in the Hart County Schools for doing so.   See Complaint, Count III [Document 1].    As will be explained below, the Plaintiff has viable claims pursuant to 42 U.S.C. Section 1983 so as to preclude summary judgment as requested by the Defendants herein.

    **Defendant Line is a "final policymaker" acting under color of state law for certain employment decision for the Hart County Schools within the context of Section 1983 claims.**

    A school district's superintendent can create a policy that subjects a school district to § 1983 liability by making one decision.   McGreevy v. Stroup, 413 F.3d 359, 367-369 (3d Cir.2005) (finding district's superintendent was final policymaker with respect to teacher ratings under

Pennsylvania law). For a school district to be held liable for a constitutional violation, the proven violation must have resulted from a school district's policy.   C.N. v. Ridgewood Bd. Of Educ., 430 F.3d 159, 173 (3d Cir.2005).   Therefore, Defendant Line can subject the Hart County, Kentucky School District and the Hart County, Kentucky Board of Education to § 1983 liability by making one unlawful and discriminatory decision under color of state law.

**A.**

**First Amendment Retaliation claim in violation of 42 U.S.C. Section 1983.**

To establish a claim under 42 U.S.C. Section 1983, a plaintiff must establish that (1) the defendants deprived him of a right, privilege, or immunity secured to him by the United States Constitution or other federal law; and (2) the defendants caused the deprivation while acting under color of state law." Dominquez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).  Moreover, to establish a *prima facie* case of First Amendment retaliation a plaintiff must show that (1) he was engaged in constitutionally protected speech; (2) he was subjected to an adverse action or was deprived of some benefit; and (3) the protected speech was a substantial or motivating factor in the adverse action.  Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003).

In order to determine whether a plaintiff engaged in constitutionally protected speech, courts usually refer to the *Connick-Pickering* test— i.e. whether the employee spoke as a citizen on a matter of public concern,  Kindle v. City of Jeffersontown, 2009 WL 69231 (W.D. Ky. 2009)(citing Pickering v. Bd. of Educ. Of Township High School Dist., 391 U.S. 563, 568 (1968)), and if so, whether his interest as a citizen in commenting on the matter of public concern outweighed the State's interest in promoting effective and efficient public service.  Connick v. Myers, 461 U.S. 138, 147 (1983).

The United States Supreme Court in Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) provided further guidance as to when a public employee can be considered, for First Amendment purposes,

to be speaking as a citizen. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti</u>, 547 U.S. at 421. Therefore, <u>Garcetti</u> requires courts to also decide whether a plaintiff was speaking "as a citizen" or as part of her public job, before asking whether the subject-matter of particular speech is a topic of public concern.  <u>Id</u>.

Although public employees' rights are subject to certain limitations, "the First Amendment protects a public employee's right … to speak as a citizen addressing matters of public concern." <u>Garcetti</u>, 547 U.S. at 417.  Whether a plaintiff's speech touches upon a matter of public concern is a question of law.  <u>Barnes v. McDowell</u>, 848 F.2d 725, 733 (6th Cir. 1988).  "Whether an employee's speech touches upon a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  <u>Garcetti</u>, 547 U.S. at 421.

**<u>Defendants deprived Plaintiff of her First Amendment right to Freedom of Speech while acting under color of state law</u>.**

KRS 160.350(1) provides that Boards of Education such as Defendant, Hart County, Kentucky Board of Education "shall appoint a superintendent of schools whose term shall begin on July 1, following the individual's appointment."  The statutory powers and duties of a superintendent in the Commonwealth of Kentucky are enumerated, in part, by the Kentucky General Assembly at KRS 160.370 and include, but are not limited to, serving as the executive agent of the school district's board of education; **ensuring that the laws relating to schools within the school district**, the bylaws, rules, and regulations of the Kentucky Board of Education, and the regulations and policies of the school district are carried into effect.  Superintendents are also statutorily responsible **for the hiring and dismissal of all personnel employed by the school district**.  <u>See</u> KRS 160.370 (emphasis added).

Accordingly, when Defendant Line engaged in personnel decisions that impacted the plaintiff and deliberately failed to uphold his duty to ensure that all the laws relating to the schools within the Hart County School District were followed, such actions are deemed the policy of Defendants Hart County School District and the Hart County Board of Education and subject them to § 1983 liability.  Moreover, since the authority to make these decisions that impacted the Plaintiff stem from powers delegated to Defendant Line by the Kentucky General Assembly, Defendant Line is deemed to have deprived Plaintiff of her First Amendment right to Freedom of Speech while acting under color of state law if this Court finds that Defendant Line retaliated against the Plaintiff for engaging in constitutionally protected speech.

<u>**Plaintiff engaged in constitutionally protected speech**</u>.

In order to determine whether a plaintiff engaged in constitutionally protected speech, courts usually refer to the *Connick-Pickering* test which requires examination of the following factors:

<u>**Plaintiff Condiff spoke as a "citizen" for First Amendment purposes when she assisted her step-daughter in reporting incidents of sexual harassment perpetrated by her step-daughter's teacher at Hart County High School to administrative personnel within the Hart County Schools**</u>.

Plaintiff spoke as a citizen when she reported the following acts of intentional discrimination to administrative personnel within the Hart County Schools:

*       Plaintiff Condiff had an overriding desire to protect her step-daughter from harm and to preserve her senior year of high school as much as possible.  Plaintiff Condiff and her husband both reflected on the fact that Plaintiff Condiff could loss her job for opposing the sexual harassment or not preventing her husband from raising the issue with the Hart County Schools.  Nonetheless,  Plaintiff Condiff allowed her husband to forward the email describing the sexual harassment by Mr. Barrett with Plaintiff Condiff's email address on it to the school principal Chris Mueller and to contact Mr. Mueller directly despite the potential future consequences with her employment;

*       Plaintiff Condiff again expressed her opposition to Mr. Barrett's repeated sexual harassment of female students including her step-daughter when she informed her husband that "that [the new allegation of harassment as well as his daughter's allegations of harassment] **has to be reported, it's obviously not been reported to the school board, to Mr. Line, it's time to call Mr. Line...**"  <u>See</u> Deposition of Chris Condiff, page 37, line 23-page 38, line 2.  Plaintiff Condiff again allowed her husband to forward the email describing the sexual

harassment by Mr. Barrett with Plaintiff Condiff's email address on it to Defendant Line and to contact Defendant Line directly despite the potential future consequences with her employment;

* On or about July 31, 2008, Plaintiff Condiff telephoned superintendent Line and verbally informed him that she felt she was being retaliated against by not being hired for the special education position since she participated in reporting that Hart County High School Teacher Keri Barrett had engaged in sexually inappropriate and offensive conversations, suggestions, and innuendoes with her step-daughter and another student during school hours at Hart County High School; and

* When Plaintiff filed her Complaint in this action asserting, in part, her opposition to discrimination and retaliation based on sex by the Defendants in violation of Title IX.

Under the principles articulated in <u>Garcetti</u>, Plaintiff spoke as citizen and not pursuant to her official duties when she reported these incidents of sexual harassment involving  her step-daughter and another student at Hart County High School via her email account to Defendant Line and other representatives of the Hart County School District.  Moreover, it is also clear that Plaintiff spoke as a citizen when she filed her Complaint in this action addressing matters of public concern via the legal forum.

**<u>Plaintiff Condiff spoke on "matters of public concern" when she assisted her step-daughter in reporting incidents of sexual harassment perpetrated by her step-daughter's teacher at Hart County High School to administrative personnel within the Hart County Schools.</u>**

As the Sixth Circuit Court of Appeals explained in <u>See v. City of Elyria</u>, 502 F.3d 484, 492 (6th Cir. 2007), "[a] matter of public concern usually involves a matter of political, social, or other concerns to the community."  The Sixth Circuit has long recognized that speech disclosing public corruption of public agencies is "exactly the type of statements that demand strong First Amendment protections."  <u>See</u>, 502 F.3d at 493 (citing <u>Solomon v. Royal Oak Twp.</u>, 842 F.2d 862, 865-66 (6th Cir. 1988)(speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection).  <u>See also</u> <u>Marohnic v. Walker</u>, 800 F.2d 613, 616 (6th Cir. 1986)("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.").

36

Similarly, in Meyers v. City of Cincinnati, the Sixth Circuit Court of Appeals held that "[j]ust as an opinion concerning the general policy of affirmative action would be a matter of public concern, so too is speech concerning methods of implementing affirmative action." Id., 934 F.2d 726, 730 (6th Cir. 1991), modified on other grounds, 979 F.2d 1154 (6th Cir. 1992). The Meyers Court concluded that "speech about a politically charged issue like affirmative action -- whether pro or con -- should be considered a matter of public concern." Id.

As in Meyers, Plaintiff's speech in this case was made known to Defendant Line and other administrative personnel with the Hart County Schools, and dealt with issues of intentional sex discrimination in a public high school. As noted in Marohnic, supra., "[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law." Here, whether children at a local high school were being sexually harassed by a teacher in violation of Title IX is clearly a matter of public concern.

**Plaintiff Condiff's interest as a citizen in commenting on a matter of public concern such as sexual harassment at a local public high school clearly outweighed the Defendants' interest in promoting effective and efficient public service.**

There is no question that the reporting of sexual harassment of students by a teacher at a local high school clearly outweighs any harm that may stem from such allegations. One of a school's primary goals should be to provide a learning environment that is safe and free from unwanted hatred, bigotry, and discrimination, and the remedial purpose of Title IX seeks to eliminate intentional sex discrimination against women at educational institutions that receive federal funding. Moreover, the Hart County School district has its own anti-discrimination policy in place that encourages reporting of discriminatory acts. Consequently, there can be no reasonable argument that the Hart County School District's and the Hart County Board of Education's interest in promoting educational services outweighs any citizens' right to protect school children from sexual harassment by a teacher by reporting the harassment to the proper authorities.

**Plaintiff Condiff's speech on "matters of public concern" involving the reporting of incidents of sexual harassment perpetrated by her step-daughter's teacher at Hart County High School to administrative personnel within the Hart County Schools was a substantial and motivating factor in Defendant Line's and/or other administrative personnel within the Hart County Schools refusal to hire the plaintiff for numerous teaching positions that plaintiff applied for in the Hart County School District.**

These issues have been discussed at length in Plaintiff's discussion of her Title IX retaliation claim. Accordingly, Plaintiff incorporates by reference the following pages of this response as being probative of the issue before the Court in this 42 U.S.C. Section 1983 First Amendment retaliation claim:

* Pages 7-14 of Response beginning with section titled "Summary of adverse employment actions taken against Plaintiff Sarah Condiff by Defendants."

* Pages 25-27 of Response beginning with section titled "Defendants took adverse employment actions against Plaintiff Condiff for engaging in a Protected Activity under Title IX."

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that Defendants' motion for summary judgment be denied.

Respectfully submitted,

   /s/    Charles W. Miller
Charles W. Miller
**MILLER & FALKNER**
Waterfront Plaza, Suite 2104
325 West Main Street
Louisville, KY 40202
(502) 583-2300
**COUNSEL FOR PLAINTIFF**

38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically this 6th day of August 2009.  Notice of this filing will be sent electronically through the Court's electronic filing system to the following:

Michael A. Owsley, Esq.
W. Cravens Priest, III, Esq.
**ENGLISH, LUCAS, PRIEST & OWSLEY, LLP**
1101 College Street
P.O. Box 770
Bowling Green, KY  42102-0770
**COUNSEL FOR DEFENDANTS**

                                               _____/s/   Charles W. Miller
                                               Charles W. Miller